[Cite as *Gorslene v. Dept. of Transp.*, 2018-Ohio-4953.]

| | |
|---|---|
| REX A. GORSLENE, et al. | Case No. 2016-00708JD |
| Plaintiffs | Magistrate Robert Van Schoyck |
| v. | DECISION OF THE MAGISTRATE |
| OHIO DEPARTMENT OF TRANSPORTATION | |
| Defendant | |

{¶1} Plaintiff, Rex A. Gorslene (hereinafter referred to as Gorslene), brought this action for negligence arising from a September 29, 2014 accident in which a state-owned vehicle operated by Charles Kiner, an employee of defendant, Ohio Department of Transportation (ODOT), backed into and injured him while he was at work on a highway construction project at the intersection of U.S. Route 42 and Section Line Road in Delaware County, which was being rebuilt and was closed to through traffic. Plaintiff, Connie Gorslene, asserts a derivative loss of consortium claim. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} Gorslene testified that at the time of the accident he had been employed with Double Z Construction for about ten years, working mainly as an equipment operator but performing various other kinds of work as well. Gorslene, who stated that he was 49 years old at the time of trial, recounted that he previously worked for Decker Construction and in total had worked in asphalt paving and other construction jobs for more than 25 years. On the day of the accident, Gorslene explained, he had been saw-cutting lines in newly-cured concrete pavement, which is done to prevent cracking. Gorslene stated that a chalk box tool he was using to mark the lines ran out of chalk, so he went to get more chalk from a jug stored in a toolbox in his boss's truck. Gorslene testified that once he retrieved the jug, he moved away from the truck and knelt with one knee on the ground. As Gorslene explained, it was better to refill the chalk box while

kneeling on the ground because it was easier to control and more shielded from the wind than if he were standing, it takes two hands to produce chalk from the jug, and he wanted to be far enough away from the truck that no chalk would get on it.

{¶3} Gorslene testified that the location where he filled the chalk box was about 5 feet from the side of his boss's truck. About 6 to 10 feet behind him, Gorslene stated, was the rear end of the state vehicle, which was parked 15 feet from the truck in his estimation. Although most of the workers parked their vehicles near a gas station away from the work zone, his boss and another boss kept their trucks nearby because they had tools on them, Gorslene explained. Gorslene, who stated that he had seen Kiner at many work sites over the years but did not know him personally, recounted that while filling the chalk box he saw Kiner along the section of U.S. Route 42 where the concrete work was going on, to the rear of the state vehicle, and heard a worker direct Kiner to move the vehicle so that it would not get sprayed with a curing compound that was about to be applied to the concrete. According to Gorslene, Kiner subsequently walked past him on the way to the state vehicle and they waved or otherwise acknowledged each other. Gorslene stated that he wore a green vest, a green shirt, and a hard hat.

{¶4} The way Gorslene described, there was a lot of activity that day and a dirt access road that construction vehicles were using to reach the site was blocked to the rear of the state vehicle, particularly by the presence of the bosses' trucks. For that reason, Gorslene felt that if Kiner were to move the state vehicle, the only direction Kiner could go was forward, away from Gorslene. Going that direction, Gorslene stated, he thought Kiner could have moved the state vehicle to the lot by the gas station where the workers parked their vehicles. Gorslene admitted that it is important to be aware of one's surroundings at a construction site. But, based upon his feeling that the route behind the state vehicle was blocked, combined with he and Kiner having acknowledged each other, Gorslene explained, he saw no reason to move or watch the vehicle. Gorslene testified that he kept filling the chalk box, remaining down on one

knee with his back to the state vehicle. Gorslene stated that there was a lot of construction noise and he never heard the state vehicle's engine or exhaust.

{¶5} Gorslene recalled that he was still working in the same spot, a minute or two after Kiner passed by, when the rear end of the state vehicle struck his back and momentarily kept backing over him. According to Gorslene, the state vehicle then pulled forward and workers yelled at Kiner to stop, which he did some 60 to 70 feet ahead. Gorslene testified that his hard hat was knocked off and he felt pain in his back and elsewhere. Gorslene recalled having help getting up and being sat down on a curb, and he remembered talking to co-workers Dennis Thacker and Carla Meinberg, but he had no recollection of talking to Kiner. Gorslene testified that paramedics came and gave him a shot to relieve the pain. An Ohio State Highway Patrol trooper also came and took a statement, Gorslene stated. (Joint Exhibit A.) Gorslene stated that an ambulance transported him to a hospital from which he was released later that day.

{¶6} Charles Kiner testified that he has been employed with ODOT for 30 years and works as an Area Engineer in the District Six Division of Construction. Kiner explained that his job involves administering construction projects, which at times requires him to visit project sites to oversee the work or address special issues, and when doing so he drives a state-owned Ford Escape. Kiner recalled that he drove the state vehicle to the project site on the day of the accident to generally oversee the progress of the work and to meet a representative from Del-Co Water Company to address an issue with a water line. Kiner testified that he drove to the site via U.S. Route 42 and parked within the highway right-of-way, in the same direction that he arrived. At that time, Kiner recalled, there were no other vehicles in the area where he parked, but workers were pouring concrete pavement 50 to 75 feet ahead. Kiner testified that the project was on an expedited schedule due to the intersection being closed and that there was a lot of activity that day, including not only the concrete paving, but drainage work as well, and he estimated that there were perhaps two dozen

workers on site.  Kiner related that he routinely parks in construction zones and was unaware that most of the workers were parking in a lot near the gas station.

{¶7} As Kiner recalled, once he parked the state vehicle he walked to the intersection to view the water line problem and wait for the Del-Co representative.  Kiner stated that while he waited he spent time talking to the crew doing the drainage work. After eventually meeting with the Del-Co representative, Kiner testified, he went back to the drainage crew and talked more about their work and issues they were having. Around that time, Kiner related, about two hours after he arrived at the site, his Transportation Manager, Jill Kirby, alerted him that he needed to move the state vehicle because the concrete work had progressed up to the area where it was parked and the workers were about to apply a concrete curing compound and did not want any overspray to get on it.

{¶8} Kiner stated that he was ready to leave the site for the day and began making his way back to the state vehicle but got stopped at an old farmhouse by residents who had questions about the project, so it took about 20 minutes to reach the vehicle from when he was asked to move it.  As Kiner described, when he got there he saw two large trucks parked nearby that had not been there earlier.  Kiner testified that he walked to the passenger side of the state vehicle and stood by the rear quarter panel "for a good minute or so" to survey the area and make sure he had a clear path to back out between the trucks and the concrete forms.  Kiner related that due to construction activities and uneven surfaces ahead of the state vehicle there was no viable path for him to leave the site by driving forward, and that it would have been difficult to turn around as well because there was limited room to maneuver and he needed to remain within the highway right-of-way.  While denying that he did so, when Kiner was asked if he at least had room to pull forward 60 to 70 feet like Gorslene recalled him doing after the collision, he affirmed that he did.  Though Kiner recalled being just two or three feet from the rear bumper when he surveyed the scene from the passenger side, rather than

walk around the back he stated that he walked around the front before making a similar survey on the driver's side. Kiner denied seeing Gorslene before the accident and was certain that Gorslene was not behind the state vehicle when he looked. According to Kiner, he then got in the state vehicle and removed his hard hat and vest, which took about 30 seconds. Kiner stated that he then not only checked all three mirrors before backing up but he individually adjusted each one to better see where he was going. The state vehicle did not have an audible back-up signal, Kiner stated.

{¶9} Kiner testified that he began backing up very slowly when, almost immediately, someone said "stop" and he heard a noise at the back of the vehicle, so he pulled forward 5 to 10 feet and parked. Kiner recalled getting out and realizing there had been a collision with one of the workers. By Kiner's estimate, he had only backed the vehicle up a couple of feet before the collision occurred, and he stated that in 30 years on the job he has never seen a construction worker kneel around a vehicle. Kiner recounted apologizing to Gorslene while workers gathered around to help him up and get him seated atop some concrete forms. Kiner stated that he did not know any of the workers, so he went to the foreman of the crew doing the drainage work, Carla Meinberg, whom he had known for many years. From what Kiner recalled, he returned with Meinberg to check on Gorslene, who told Meinberg he was okay and that it was just an accident.

{¶10} Paramedics arrived shortly thereafter and attended to Gorslene, Kiner stated, eventually putting Gorslene on a backboard and transporting him from the scene. Kiner related that an Ohio State Highway Patrol trooper came and took a statement from him. (Joint Exhibit A.) Kiner authenticated some photographs of the construction site that he took that day, before the accident. (Defendant's Exhibit C.) Kiner also authenticated photographs of the rear end of the state vehicle taken the following day after he noticed chalk on the bumper. (Defendant's Exhibit D.)

{¶11} Dennis Thacker testified that he is employed with Double Z Construction and has worked in the construction trade for many years. Thacker stated that he knew Gorslene from working together occasionally on large projects, but that they worked on different crews and never socialized outside of work. According to Thacker, there was a lot of activity at the site on the day of the accident, with about 30 workers from Double Z plus cement contractors and others. Thacker recalled that most workers, including himself, parked their vehicles in a lot behind the gas station at the corner, outside the work zone.

{¶12} Thacker testified that he was part of a crew putting in a concrete base for the rebuilt roadways and that the work progressed that day from the intersection outward along the section of U.S. Route 42 where Kiner had parked. According to Thacker, the state vehicle was parked in such a way that it obstructed a dirt access road for construction vehicles that ran parallel to the actual roadbed. Thacker stated that he eventually asked Kiner to move the state vehicle because workers were about to spray a concrete curing compound near the vehicle and because a cement truck would be coming in soon. Thacker stated that he does not know if other vehicles were parked near the state vehicle, but that it was the only vehicle getting in the way of construction activities. When shown a diagram of the scene, Thacker testified that if the bosses' trucks were parked as depicted in the diagram, they would have been far enough away from the access road and the spraying to avoid any problems. (Joint Exhibit B.) In Thacker's recollection, when he asked Kiner to move the state vehicle Kiner was standing near the area where the concrete work was being performed. Thacker recalled hearing others tell Kiner to move the state vehicle as well.

{¶13} Thacker testified that Kiner proceeded to walk behind the state vehicle and get inside. In doing so, Thacker stated, Kiner walked past Gorslene, whom he estimated was knelt 5 to 10 feet behind the state vehicle, filling a chalk box. According to Thacker, he assumed Kiner would drive forward, not in reverse, and he did not think

Gorslene was in any danger. When asked whether it appeared that Kiner would have been able to see Gorslene from his rear-view mirrors, Thacker stated that he did not reckon so. Thacker also stated that in his experience most vehicles in construction sites are larger and have backup signals, but he acknowledged that most small SUVs like the state vehicle are not so equipped. When he saw the state vehicle begin to back up, Thacker testified, he yelled ho, ho, ho several times and approached the vehicle to get Kiner to stop, but Kiner stopped about two seconds too late to avoid Gorslene. From what Thacker recalled, Kiner then pulled forward as if he was going to drive away but he ultimately stopped, at which point Thacker and others ran over to help Gorslene.

{¶14} "In order to sustain an action for negligence, a plaintiff must show the existence of a duty owing from the defendant to the plaintiff or injured party, a breach of that duty, and that the breach was the proximate cause of resulting damages." *Sparre v. Dept. of Transp.*, 2013-Ohio-4153, 998 N.E.2d 883, ¶ 9 (10th Dist.). "A defendant's duty typically may be established by common law, legislative enactment, or by the particular facts and circumstances of a case." *Galay v. Dept. of Transp.*, 10th Dist. Franklin No. 05AP-383, 2006-Ohio-4113, ¶ 52. "[T]he existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 773 N.E.2d 1018, 2002-Ohio-4210, ¶ 23. "Clearly, all motorists have a duty to observe the environment in which they drive, not only in front of their vehicle, but to the sides and rear as the circumstances may warrant." *Hubner v. Sigall*, 47 Ohio App.3d 15, 17, 546 N.E.2d 1337 (10th Dist.1988); *see also Bell v. Giamarco*, 50 Ohio App.3d 61, 64, 553 N.E.2d 694 (10th Dist.1988). "Negligence in a motor vehicle case is the failure to exercise ordinary care to avoid injury to others." *Manley v. Wal-Mart Stores, Inc.*, 152 Ohio App.3d 544, 2003-Ohio-1756, ¶ 23 (5th Dist.); *see also Foulke v. Beogher*, 166 Ohio App.3d 435, 2006-Ohio-1411, ¶ 9 (3d Dist.). "Reasonable or

ordinary care is that degree of caution and foresight that an ordinarily prudent person would employ in similar circumstances." *Woods v. Ohio Dept. of Rehab. & Corr.*, 130 Ohio App.3d 742, 745, 721 N.E.2d 143 (10th Dist.1998).

{¶15} Upon review of the evidence presented at trial, the magistrate makes the following findings. On September 29, 2014, Gorslene was at work on the project to rebuild the intersection of U.S. Route 42 and Section Line Road. Kiner came to the project site travelling southwest on U.S. Route 42 and parked the state vehicle in a dirt area or access road that extended along the length of the actual roadway being rebuilt. When Kiner parked, there were no other vehicles parked nearby, but construction workers ahead of him were pouring a concrete base for the new roadway as close as 50 feet from where he parked. Kiner left the state vehicle and spent over two hours attending to issues involving drainage work near the gas station at one corner of the intersection, to the water line issue on the opposite corner, talking to local residents, and generally checking on the progress. During that time, construction of the concrete base for the roadway that was being rebuilt progressed northeast along U.S. Route 42 and reached the vicinity of the parked state vehicle.

{¶16} Workers involved with the concrete work became concerned about the state vehicle getting in the way of their activities, particularly the application of a curing compound, so Kiner was asked to move it. Using Kiner's estimate, by the time he returned to the state vehicle it had been parked in the same spot for about 2 hours and 20 minutes. There were discrepancies among the witnesses about the way Kiner returned and whether he and Gorslene saw each other. Gorslene and Thacker recalled Kiner being near the concrete work when construction workers asked or told him to move the state vehicle such that he would have walked past Gorslene, and Kiner told the State Highway Patrol that it was a construction worker who directed him to move the vehicle. Kiner's testimony, on the other hand, was that an ODOT transportation manager asked him to move the state vehicle and that he went straight there after

talking to some local residents such that he would not have walked past Gorslene. No matter how Kiner returned to the state vehicle, however, the greater weight of the evidence demonstrates that Gorslene was working several feet away from it when Kiner returned and that if appropriate care under the circumstances had been exercised, Kiner should have known that he could not safely back the vehicle up.

{¶17} There was significant construction activity taking place around the state vehicle, which was parked between a truck on one side and concrete forms for the new roadway on the other side, and there were numerous workers on site. As Kiner told the State Highway Patrol, it was a "congested work zone." Simply put, the state vehicle was situated squarely amid a busy, fast-paced construction environment with many people and moving parts. Under the circumstances Kiner had a duty to see that there were no persons, equipment, or other obstacles behind the state vehicle that would prevent him from safely backing out. Gorslene, a veteran construction worker, was visible in his green safety vest, green shirt and hard hat while working out in the open approximately 6 to 10 feet away from the state vehicle. Other workers had no trouble seeing Gorslene and recognizing the danger as soon as the state vehicle began to back up.

{¶18} Noting the precautions Kiner described taking to survey the area behind the state vehicle, ODOT suggests Gorslene may have suddenly appeared during the 30 seconds Kiner said it took to get situated in the vehicle before he checked the mirrors, but the evidence tends to establish that Gorslene was there all along. It is unlikely that within such a short time Gorslene walked over to his boss's truck from some other location, opened a toolbox in the truck and retrieved a jug of chalk, walked away from the truck, knelt and got to work filling the chalk box. Gorslene told the State Highway Patrol he had been there for about four minutes. Moreover, whether Kiner initially saw Gorslene before he got in the state vehicle and forgot or simply never saw him at all, the magistrate is persuaded by Gorslene's testimony that he did see Kiner while filling his

chalk box and that he remained in the same spot when the accident occurred. Thacker also saw Gorslene in that spot before Kiner returned to the state vehicle.

{¶19} ODOT, while denying any liability, also argues that any possible negligence on its part is outweighed by contributory negligence by Gorslene, but the evidence does not bear this out. Gorslene wore safety gear and was engaged in a normal work duty in plain sight several feet away from the state vehicle, which had been parked with the engine off for over two hours. Gorslene made it a habit to keep his distance from any vehicles when filling a chalk box so he would not get chalk on them. (It is noted that the photographs admitted as Defendant's Exhibit D show chalk on the rear bumper of the state vehicle, but this could have resulted from the collision itself and cannot be taken as proof of Gorslene's proximity to the state vehicle.) Gorslene, having seen Kiner and thinking that Kiner acknowledged or at least saw him too, did not have reason to think Kiner would then back the state vehicle toward him. There was no audible signal from the state vehicle when it backed up and Gorslene, working in the loud environment of the construction site, did not otherwise hear it approach. In *Jarrell v. Woodland Mfg. Co.*, 7 Ohio App.3d 320, 323, 455 N.E.2d 1015 (10th Dist.1982), where a worker in a foundry yard started performing a job task behind a dump truck—which sat stationary with the engine running—and was injured when the truck subsequently backed into him without warning, the Tenth District Court of Appeals held that under the circumstances there was virtually no evidence of contributory negligence. Here too the circumstances similarly preclude a finding of contributory negligence.

{¶20} Based upon the foregoing, the magistrate concludes that Gorslene has proven his claim of negligence by a preponderance of the evidence. Accordingly, it is recommended that judgment be entered in Gorslene's favor on the issue of liability, with the extent of his damages, as well as the derivative loss of consortium claim, to be determined in further proceedings.

**{¶21}** *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

**Filed November 30, 2018**
**Sent to S.C. Reporter 12/10/18**